UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JORDAN P. AULIZIO, | ) | CASE NO.: 4:24-CV-01646 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| v. | ) | |
| | ) | |
| SEAN WHITEHOUSE, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Defendant Shawn Whitehouse ("Whitehouse") moves for summary judgment.[1] (Doc. 26.) Plaintiff Jordan P. Aulizio ("Aulizio") opposed (Doc. 27), and Whitehouse replied (Doc. 29). For the reasons stated herein, the Motion for Summary Judgment is GRANTED.

## I. BACKGROUND

### A. Statement of Facts

On July 7, 2023, Aulizio went to a Dollar General in Kinsman Township. (Doc. 1 at ¶ 5.) While in the store, Aulizio nodded off while standing up. (*Id.* at ¶¶ 5, 6.) Seeing this, someone in the store called 911. (*Id.* at ¶ 6.) Whitehouse, an Emergency Medical Technician ("EMT") from Johnston Township Fire Department, was dispatched to the store because Aulizio was reportedly "about to pass out." (Doc. 26 at 241-42; *see also* Doc. 26-2, Whitehouse Affidavit, at ¶ 3.)[2] Law enforcement and other emergency medical personnel were there when Whitehouse

[1] Although the case caption lists Defendant's first name as "Sean" the correct spelling appears to be "Shawn." (*See* Doc. 26 at 240.)

[2] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

arrived. Those present included Cory Van Kanegan ("Van Kanegan"), volunteer Fire Chief of Kinsman Township, and Kinsman Township Police Officer Ellwood-Bellas ("Ellwood-Bellas"). The incident was captured by Ellwood-Bellas's body camera. (Doc. 24, Body Camera.)[3] Whitehouse is wearing the navy blue "Johnston Twp. Fire" shirt. (*Id.* at 12:37:44-47; Doc. 26-2 at ¶ 5.)

The body camera footage begins with Whitehouse exiting a Kinsman Fire EMS ambulance. (Doc. 24 at 12:37:44.) Ellwood-Bellas asks Aulizio "what's wrong?" (*Id.*) The beginning of Aulizio's response is unintelligible, but he later states his ride left him. (*Id.* at 12:37:46-49.) Aulizio tells Ellwood-Bellas he is going to leave his car "until they bring my key." (*Id.* at 12:38:00.) Ellwood-Bellas asks if Aulizio passed out. (*Id.* at 12:38:04.) Aulizio says he was "in the ICU." (*Id.*) Aulizio then says in the direction of Van Kanegan and Whitehouse, who are off camera, "I didn't overdose in jail." (*Id.* at 12:38:13.) Van Kanegan states, "That's not what I was told," and asks whether Aulizio was in jail because he overdosed. (*Id.* at 12:38:14-21.)

When Aulizio explains he was already sentenced for a DUI, Van Kanegan responds, "We all know that. We see you all the fucking time. You know that as well as I do . . . so you're going to sit here and tell me you're not now?" (*Id.* at 12:38:25-32.) Aulizio questions, "What, overdosing?" (*Id.* 12:38:33.) Van Kanegan continues to question whether Aulizio has ever overdosed, and Aulizio's response is not coherent. (*Id.* at 12:38:34-12:38:41.) Van Kanegan eventually states, "I know that both of us standing here have pushed Narcan on you before, so you can lie all you want." (*Id.* at 12:38:42-45.) Ellwood-Bellas and Van Kanegan are heard

---

[3] The body camera timestamp begins at 12:37:44. (Doc. 24.) All references to the body camera herein will use the timestamp on the video.

asking Aulizio how he got there. (*Id.* at 12:38:48-50.) Aulizio says he did not drive to the Dollar General as he walks toward his own car in the parking lot. (*Id.* at 12:38:51.)

Whitehouse then tells Aulizio he has two ambulances coming from Cortland for him because Aulizio went into the Dollar General and was passing out. (*Id.* at 12:39:05-14.) Whitehouse says, "Your pupils are pinpoint." (*Id.* at 12:39:14-15.) Aulizio states he just got out of the ICU, and Van Kanegan remarks, "Getting out of the ICU has nothing to do with your pinpoint pupils." (*Id.* at 12:39:18-24.)

Aulizio walks away from Whitehouse and Van Kanegan to retrieve something from his car. (*Id.* at 12:39:28-40.) He attempts to walk away from the scene to wait for his ride. (*Id.*) Ellwood-Bellas tells Aulizio to "wait over here" and that the EMTs "are leaving." (*Id.* at 12:39:44-49.) Aulizio walks back toward the Dollar General. (*Id.*) Ellwood-Bellas asks him again how he got there. (*Id.* at 12:39:53.) Aulizio says a friend took him up to the store, but his response trails off. (*Id.* at 12:39:57-12:40:03.) Ellwood-Bellas directs Aulizio to sit on the curb. (*Id.* at 12:40:04-08.) Aulizio insists his friend lives nearby, and he will just walk home. (*Id.* at 12:40:12-16.) Ellwood-Bellas responds, "You're not walking anywhere . . . you're in no condition to walk right now, Jordan." (*Id.* at 12:40:16-21.) When Aulizio questions him, Ellwood-Bellas explains, "because your pimples are like that big," referring to Aulizio's pupils. (*Id.* at 12:40:21-26.)

Ellwood-Bellas can be heard communicating over the radio. (*Id.* at 12:40:29-57.) He confirms Aulizio has an outstanding warrant for a probation violation on a DUI. (*Id.*) As Aulizio walks away from the scene, Ellwood-Bellas tells Whitehouse and Van Kanegan that Aulizio has a warrant and says, "let's go." (*Id.* at 12:40:57-41:01.)

Ellwood-Bellas and Van Kanegan pursue Aulizio on foot as Aulizio begins to run away. (*Id.* at 12:41:02-15.) Whitehouse stays behind in the Dollar General parking lot. (*Id.*) Ellwood-Bellas brings Aulizio to the ground and Van Kanegan assists with handcuffing. (*Id.* at 12:41:17-12:42:02.) Aulizio resists. (*Id.*) Van Kanegan mentions Narcan and overdosing. (*Id.* at 12:42:01-05.) Once handcuffed, Aulizio is walked back to the Dollar General parking lot. (*Id.* at 12:42:07-57.) A younger EMT can be seen putting on light blue gloves and holding a small white case while walking alongside Van Kanegan (hereinafter "EMT 1"). (*Id.* at 12:42:35-45.)

Back in the Dollar General parking lot, Whitehouse is standing outside the driver's side of the Kinsman Fire EMS ambulance. (*Id.* at 12:42:50-53-55.) Another EMT wearing a light grey shirt, khaki shorts, and brown boots is walking away from Aulizio as Ellwood-Bellas engages with Aulizio (hereinafter "EMT 2"). (*Id.* at 12:42:53.) An additional EMT with glasses, dark blue gloves, and holding a red medical equipment case exits the Dollar General and walks toward Aulizio (hereinafter "EMT 3"). (*Id.* at 12:43:03-06.) Aulizio insists he is just dehydrated and those on the scene do not know his situation. (*Id.* at 12:43:00-22.) Van Kanegan responds that everyone knows his situation. (*Id.* at 12:43:22-27.) Whitehouse enters the frame and mentions Narcan. (*Id.* at 12:43:34.) Aulizio asks, "Narcan me, for fucking what?" (*Id.* at 12:43:34-36.) Van Kanegan says, "Because you're fucking high." (*Id.* at 12:43:37.) Aulizio denies he is high and states he is not getting "Narcaned." (*Id.* at 12:43:37-46.) Aulizio argues they cannot just Narcan someone who is fine. (*Id.* at 12:43:53-57.) Van Kanegan responds, "You're not fine." (*Id.* at 12:43:58.)

Ellwood-Bellas places Aulizio against the hood of the police vehicle. (*Id.* at 12:44.) Ellwood-Bellas is wearing black gloves. (*Id.*) Whitehouse is on Aulizio's right side holding a nasal syringe in his right hand. (*Id.*) Van Kanegan and Ellwood-Bellas are holding Aulizio

against the vehicle. (*Id.* at 12:44:01-09.) Whitehouse attempts to administer Narcan to Aulizio through the nasal syringe in his right hand while also holding onto Aulizio with his left hand. (*Id.*) Aulizio says he resists the Narcan. (*Id.* at 12:44:09.) Aulizio's face is not visible while Whitehouse attempts to administer the Narcan. (*Id.* at 12:44:09-15.) Ellwood-Bellas radios to "send whoever you got" because "we're fighting [Aulizio] again." (*Id.*) Whitehouse, Van Kanegan, and Ellwood-Bellas bring Aulizio to the ground. (*Id.* at 12:44:16-24.)

Once Aulizio is on the ground, Whitehouse is holding Aulizio's leg. (*Id.* at 12:44-25-34.) Aulizio is moving his leg, and Whitehouse dares Aulizio to kick him. (*Id.*) EMT 3 is on Whitehouse's right side. (*Id.* at 12:44:34-36.) EMT 1 is on Whitehouse's left side. (*Id.*) Whitehouse lets go of Aulizio's leg and retrieves the syringe of Narcan from the hood of the police vehicle with his right hand. (*Id.*) As Whitehouse approaches Aulizio with the Narcan, he places his left hand back on Aulizio's leg and moves the syringe in his right hand toward Aulizio. (*Id.* at 12:44:34-38.)

Aulizio continues physically resisting the Narcan. (*Id.* at 12:44:38-39.) Whitehouse can no longer be seen on camera. (*Id.* at 12:44:39-48.) Ellwood-Bellas asks who just kicked him. (*Id.* at 12:44:40-49.) Van Kanegan can be seen kneeling on Aulizio's right side and Whitehouse is on Aulizio's left side. (*Id.* at 12:44:50-54.) They are holding Aulizio to the ground. (*Id.*) Van Kanegan says "push this fucking Narcan." (*Id.* at 12:44:57.)

Whitehouse is no longer on camera. (*Id.* at 12:44:57-12:45:21.) He can be heard saying "get me oxygen Andy." (*Id.* at 12:45:15-17.) EMT 2 can be seen running away from Aulizio and toward the Kinsman Fire EMS ambulance. (*Id.* at 12:45:22-23.)

Aulizio is still held on the ground. (*Id.* at 12:44:57-12:45:26.) Only one of Aulizio's legs and Van Kanegan's legs are on camera. (*Id.*) Van Kanegan accuses Aulizio of blowing his nose

on him and is heard slapping Aulizio. (*Id.* at 12:45:22-26.) Aulizio exclaims Van Kanegan "just smacked the fuck out of me for no reason." (*Id.* at 12:45:27-30.) It is not clear from the camera angle who administered the Narcan. (*Id.* at 12:45:18-12:45:33.) EMT 1 places the vial of Narcan onto the ground next to Aulizio. (*Id.* at 12:45:33.) Whitehouse asks again for someone to get him oxygen. (*Id.* at 12:45:50-52.) Ellwood-Bellas radios that EMS administered Narcan. (*Id.* at 12:45:52-46:08.)

EMT 3 approaches Aulizio's right side and asks him what he took. (*Id.* at 12:46:20.) Aulizio denies taking anything and reiterates he just got out of the ICU for being dehydrated. (*Id.* at 12:46:20-32.) Van Kanegan can be heard stating "pinpoint pupils don't come from dehydration." (*Id.* at 12:46:32-34.) Van Kanegan adds, "Your pupils are almost gone." (*Id.* at 12:46:38.) EMT 3 continues to engage with Aulizio. (*Id.* at 12:46:40-12:47:00) EMT 1 is on Aulizio's left side. (*Id.* at 12:46:43-12:47:00.) Whitehouse can be seen kneeling on the ground to Aulizio's left while holding oxygen to his face. (*Id.* at 12:47:02-06.)

Aulizio insists he cannot be "Narcaned" while he is awake. (*Id.* at 12:47:17-20.) Someone on the scene replies "you weren't awake in the store." (*Id.* at 12:47:23.) Aulizio continues to go back and forth with emergency medical personnel on the scene. (*Id.* at 12:47:23-38.) They tell Aulizio he cannot be taken to the county jail while high. (*Id.*)

Aulizio admitted faking a seizure while in the back of the police cruiser so he would be taken to the hospital. (Doc. 22-1, Aulizio Depo., at 154, 168-72.) Aulizio was taken to the hospital in an ambulance. (*Id.*)

At his deposition, Aulizio testified that Whitehouse administered the first dose of Narcan to him while he was up against the police vehicle.[4] (*Id.* at 152-53.) He was in police custody at

[4] There is no deposition testimony from Whitehouse in the record.

that point. (*Id.*) Aulizio also testified he received another dose of Narcan when he was on the ground, but he could not recall who administered it. (*Id.* at 153-54.) Aulizio believed Narcan only makes a person sick if they are on opioids. (*Id.*) He further testified he did not have opioids in his system during the incident. (*Id.* at 150.) Aulizio admitted the Narcan did not make him sick and caused no physical side effects. (*Id.* at 150-51, 171-72.) He claims he got PTSD from the incident. (*Id.* at 151, 172.) Aulizio had a history of drug abuse prior to the incident. (*Id.* at 164.)

### B. Procedural History

On September 26, 2024, Aulizio brought this action against Whitehouse, alleging Whitehouse violated his constitutional rights to bodily integrity and against excessive force in violation of the Fourth and Fourteenth Amendment. (Doc. 1 at ¶¶ 10-13.) He also alleged state-law claims for assault and battery and intentional infliction of emotional harm. (*Id.* at ¶¶ 14-19.) On November 14, 2025, Whitehouse moved for summary judgment on all claims. (Doc. 26.) The motion is fully briefed. (Docs. 27, 29.) Aulizio only disputes the alleged violation of his right to bodily integrity.[5] (Doc. 27 at 281.)

## II. LAW AND ANALYSIS

### A. Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories,

[5] Aulizio concedes he only opposes summary judgment on the bodily integrity claim and is not proceeding on his other claims. (Doc. 27 at 281.) Accordingly, those claims are abandoned. *See Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564 n.1 (6th Cir. 2021); *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases); *see also Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 839 (E.D. Mich. 2008).

and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of showing that no genuine issues of material fact exist." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted). A "material" fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[A] genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 898 (6th Cir. 2020) (citations and quotations omitted). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co., Inc.*, 395 F.3d 338, 342 (6th Cir. 2005) (citation omitted). A party asserting or disputing a fact must cite evidence in the record or show the record establishes either the absence or the presence of a genuine dispute. *See* FED. R. CIV. P. 56(c), (e). Rule 56 further provides "[t]he court need consider only" the materials cited in the parties' briefs. FED. R. CIV. P. 56(c)(3); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citations omitted).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citations and quotations omitted). The Court's role is not to make credibility determinations or "weigh"

conflicting evidence. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Id.*

Where a plaintiff asserts a claim in his complaint but fails to address those claims in response to a motion for summary judgment, the plaintiff has abandoned that claim. *See Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564 n.1 (6th Cir. 2021) (plaintiff abandoned claims not discussed in opposition to motion for summary judgment); *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); *see also Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 839 (E.D. Mich. 2008) (collecting cases) ("It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment.")

### B. Substantive Due Process Right to Bodily Integrity

"To state a claim under § 1983, a plaintiff must set forth facts that, when favorably construed, establish: (1) the deprivation of a right secured by the Constitution or laws of the United States; (2) caused by a person acting under the color of state law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citations omitted); *see also West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988). There is no dispute Whitehouse was acting under color of state law.[6]

[6] Whitehouse argues Aulizio's claim fails because he did not administer Narcan and cannot be held liable under § 1983 for another's conduct. (Doc. 26 at 247-48.) Aulizio states an active participant can be held liable, and the body camera footage shows Whitehouse actively participated in the alleged violation. (Doc. 27 at 286-88.) Aulizio is correct on this point of law.

The constitutional right at issue is the Fourteenth Amendment substantive due process right to bodily integrity. (*See* Doc. 27 at 284.) Both parties rely on the body camera footage in support of their arguments.[7] (*See* Doc. 26 at 245-47; Doc. 27 at 283-85.)

Whitehouse asserts qualified immunity. "The doctrine of qualified immunity provides that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 738 (6th Cir. 2022) (quoting *Williams*, 9 F.4th at 430).

Once asserted by a defendant, a "[p]laintiff bears the burden of showing that defendants are not entitled to qualified immunity." *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)); *see also Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022). In viewing the evidence in a light most favorable to the plaintiff, the plaintiff must demonstrate both the challenged conduct violated a constitutional right and the right was clearly established at the time of the defendant's alleged misconduct. *See*

---

*See Sexton v. Cernuto*, 18 F.4th 177, 185-86 (6th Cir. 2021); *Frenchko v. Monroe*, 160 F.4th 784, 800 (6th Cir. 2025) (citing *Sexton*, 18 F.4th at 185). The recording forecloses Whitehouse's argument because it depicts Whitehouse actively assisting with administering Narcan to Aulizio even if Whitehouse did not administer it himself. (*See* Doc. 24 at 12:44:01-09, 12:44:16-38.)

[7] Whitehouse also contends he is entitled to summary judgment under the "physical evidence rule" because the recording shows he never administered Narcan to Aulizio. (Doc. 26 at 245-47.) He maintains no Narcan was administered during the first attempt, and he could not have administered Narcan during the second attempt because he experienced a respiratory attack. (*Id.*) The facts should be viewed in the light depicted by the video recording. *See Scott v. Harris*, 550 U.S. 372, 378-81, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). But where the recording can be interpreted in multiple ways, any gaps or uncertainties must be construed in Aulizio's favor. *See Latits v. Phillips*, 878 F.3d 541, 544-47 (6th Cir. 2017); *Naji v. City of Dearborn*, 120 F.4th 520, 523 (6th Cir. 2024); *Nash v. Bryce*, 157 F.4th 436, 440 (6th Cir. 2025). Whitehouse is not visible during either Narcan attempt. (Doc. 24 at 12:44:09-15, 12:44:39-12:45:33.) The recording does not conclusively demonstrate Whitehouse can be ruled out as the one who administered Narcan.

*Lawler v. Hardeman Cnty.*, 93 F.4th 919, 925 (6th Cir. 2024); *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014); *Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015). "If the plaintiff fails to establish either element, the defendant is immune from suit." *T.S. v*, 742 F.3d at 635. "Between these two considerations, [the Court] may take them in either order. *Hall v. Navarre*, 118 F.4th 749, 759 (6th Cir. 2024) (citing *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)).

The Court's analysis begins and ends with the constitutional violation prong. To show a violation of his substantive due process rights, Aulizio must demonstrate two components: (1) a deprivation of a constitutionally protected liberty interest; and (2) the government conduct "shocks the conscience." *See Guertin v. State*, 912 F.3d 907, 922 (6th Cir. 2019), *cert. denied*, 589 U.S. 1167, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020); *see also Siefert v. Hamilton Cnty.*, 951 F.3d 753, 765-66 (6th Cir. 2020) (clarifying the substantive due process analysis is a two-part inquiry).

**1. Deprivation of Liberty Interest**

"The Fourteenth Amendment prohibits the state from 'depriv[ing] any person of life, liberty, or property, without due process of law.'" *Mitchell v. City of Benton Harbor, Mich.*, 137 F.4th 420, 430 (6th Cir. 2025) (quoting U.S. CONST. amend. XIV, § 1). The right to bodily integrity is a fundamental substantive due process right. *See Guertin*, 912 F.3d at 918-19; *see also Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012) ("Under the substantive due process clause of the Fourteenth Amendment, individuals possess a constitutional right to be free from forcible physical intrusions of their bodies against their will, absent a compelling state interest.") (collecting cases). "[T]he central tenet of the Supreme

Court's vast bodily integrity jurisprudence is balancing an individual's common law right to informed consent with tenable state interests[.]" *Guertin*, 912 F.3 at 919 (citation omitted).

The right to bodily integrity includes "[t]he ability to refuse medical treatment[.]" *Capen v. Saginaw Cnty.*, 103 F.4th 457, 463 (6th Cir. 2024) (citing *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990) ("a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment")). "[T]he right to refuse unwanted medical treatment . . . is based on 'well-established, traditional rights to bodily integrity and freedom from unwanted touching.'" *Id.* at 464 (quoting *Vacco v. Quill*, 521 U.S. 793, 807, 117 S. Ct. 2293, 138 L. Ed. 2d 834 (1997)). Informed consent is generally required for medical treatment. *See Guertin*, 912 F.3d at 920 (citations and quotations omitted). "'The forcible injection of a medication into a nonconsenting person's body represents a substantial interference with that person's liberty' . . . And this is especially so when the foreign substance 'can have serious, even fatal, side effects' despite some therapeutic benefits." *Id.* at 919 (quoting *Washington v. Harper*, 494 U.S. 210, 229, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990)).

Whitehouse asserts there is no constitutional violation. (Doc. 26 at 249-51.) As a paramedic, he should be entitled to qualified immunity because he was acting in a valid medical capacity. (*Id.*) To support his argument, Whitehouse relies on *Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 221 (6th Cir. 2007), and *McKenna v. Edgell*, 617 F.3d 432, 439-440 (6th Cir. 2010).

In *Peete*, medical responders restrained plaintiff, who was experiencing a seizure, to provide medical aid. 486 F.3d at 220. He could not breathe and died. *Id.* The court held improper medical treatment by paramedics, standing alone, did not violate the Fourth or

Fourteenth Amendment where paramedics responded to a medical emergency. *Peete*, 486 F.3d at 220-22. This is because the Fourth Amendment excessive use of force claim was presented as something akin to a medical malpractice claim against defendants providing medical aid. 486 F.3d at 222. In *McKenna*, the plaintiff alleged a Fourth Amendment violation when police officers seized him and searched his home when they responded to a medical emergency call about plaintiff having a seizure. 617 F.3d at 443. In determining whether the holding in *Peete* applied to the alleged Fourth Amendment violations, the court held the relevant inquiry is whether the officers were acting "in a law-enforcement capacity or emergency-medical-response capacity." 617 F.3d at 439-40.

Aulizio asserts *Peete* is inapposite. (Doc. 27 at 290-91.) The Court agrees. While it is true Whitehouse was acting in a medical capacity, both *Peete* and *McKenna* focused on alleged Fourth Amendment violations and dealt with distinguishable factual scenarios.[8]

Aulizio maintains forced Narcan deprived him of his liberty interest in bodily integrity. (*See* Doc. 27 at 284.) Citing to several cases, Aulizio contends the Supreme Court and Sixth Circuit have found forced medication for non-consenting individuals violates his substantive due process right of bodily integrity. (*Id.* at 284-85.) The recording shows Whitehouse attempted to administer Narcan while Aulizio was restrained. (*Id.* at 285.) Aulizio clearly stated he did not consent to receiving Narcan. (*Id.* at 285.) To Aulizio, this is conclusive evidence of a violation of his bodily integrity.

---

[8] Although the plaintiff in *Peete* raised a Fourteenth Amendment substantive due process violation, the court held the emergency personnel were not required to provide adequate medical care because the decedent was not in custody and the state-created danger exception did not apply. 486 F.3d at 222-23. There is no dispute Aulizio was in custody.

Whitehouse replies that administering a non-invasive, side-effect free medication to a known drug user presenting signs of drug overdose in the heat of the moment is not a substantive due process violation. (Doc. 29 at 300-02.) And he argues Aulizio's cited cases provide no support. (*Id.*)

Aulizio first relies on *Sell v. United States*, 539 U.S. 166, 178-79, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003), for the general proposition that an individual has a constitutionally protected interest to be free from forced medication. But in *Sell*, the Supreme Court held the government's interest in prosecution may allow the government to involuntarily administer antipsychotic drugs to render a mentally ill defendant competent to stand trial. 539 U.S. at 175-79. The relevant consideration is whether the medication's efficacy, side effects, possible alternatives, and medical appropriateness overcome the individual's protected interest in refusing the medication. *Id.* at 183. Aulizio further cites to *Guertin* and *Dewine* to assert "[t]he Sixth Circuit has also held that forcibly injecting medicine into the body of a non-consenting individual substantially interferes with that person's liberty." (Doc. 27 at 285.) But the *Guertin* court dealt with whether government officials caused Flint residents to consume a toxin with no known benefit after representing the water was safe to drink. 912 F.3d 907. And the *Dewine* court considered the constitutionality of a state statute regulating the use of an abortion medication. 696 F.3d 490.

Although the cases Aulizio cites are distinguishable on the facts, bodily integrity jurisprudence recognizes a broad right to be free from forced medication. As the Sixth Circuit explained in *Guertin*, "[i]nvoluntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value . . . is a classic example of invading the core of the bodily integrity protection." 912 F.3d at 920-21. But the court also recognized "[t]he [Supreme] Court could not have been clearer in *Harper* when it stated that '[t]he forcible injection of medication

into a nonconsenting person's body represents a substantial interference with that person's liberty.'" *Id.* at 934 (quoting *Harper*, 494 U.S. at 229). The Sixth Circuit held "an individual's right to bodily integrity is sacred, founded upon informed consent, and may be invaded only upon a showing of a government interest." *Id.* at 933-34 (collecting cases). The case law ultimately focuses on whether the government had a compelling state interest for the intrusion, which is encompassed by the conscience-shocking inquiry.

While Whitehouse points to Aulizio's testimony acknowledging Narcan had no physical side effects on him, Aulizio also testified Narcan would have made him sick if he had opioids in his system. (*See* Doc. 22-1 at 150-51, 153-54, 171-72.) And Whitehouse believed Aulizio did have opioids in his system. (*See* Doc. 24 at 12:47:23-38.) In any event, there is no evidence before the Court on the medical side effects of Narcan. At bottom, the recording demonstrates Aulizio was forcibly restrained and did not consent to Narcan. At this stage, the evidence must be viewed in a light most favorable to Aulizio. Even so, his bodily integrity claim fails on the conscience-shocking prong.

**2. Conscience-Shocking Conduct**

Aulizio must show Whitehouse's conduct "shocks the conscience." *See Guertin*, 912 F.3d at 922; *Siefert*, 915 F.3d at 765-66. He cannot. "Conscience-shocking" behavior is more than mere negligence. *Siefert*, 915 F.3d at 766. It must be conduct "so 'brutal' and 'offensive' that [it does] not comport with traditional ideas of fair play and decency" or civilized conduct. *Range v. Douglas*, 763 F.3d 573, 589-90 (6th Cir. 2014) (quoting *Sacramento v. Lewis*, 523 U.S. 833, 846-47, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)); *see also Guertin*, 912 F.3d at 923. To prevent "transforming run-of-the-mill tort claims into constitutional" violations, only the most egregious official conduct qualifies as conscience-shocking. *See Guertin*, 912 F.3d at 923;

*Novak v. Federspiel*, 140 F.4th 815, 822-23 (6th Cir. 2025). "[U]njustifiable and intentionally injurious conduct" is usually conscience-shocking. *Mitchell*, 137 F.4th at 430.

When conduct falls somewhere between negligence and intentionally injurious, courts "evaluate the conduct in context to determine if the official was deliberately indifferent to a known risk of harm . . . ." *Id.* Considerations include "'the time for deliberation, the nature of the relationship between the government and the plaintiff, and whether a legitimate government purpose motivated the official's act.'" *Id.* at 431 (quoting *Guertin*, 912 F.3d at 924). The Court must find the governmental actor chose to act despite a subjective awareness of substantial risk of serious injury, and that he did not act in furtherance of a governmental purpose that justified taking that risk. *Guertin*, 912 F.3d at 924 (citations and quotations omitted).

The Fourteenth Amendment imposes an affirmative duty to provide adequate medical care to pretrial detainees. *See Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989)). Aulizio's arrest, the first responders' duty to provide him adequate medical care as a pretrial detainee, and that first responders reasonably believed Narcan was immediately necessary to reverse a suspected opioid overdose are relevant to the Court's shocks-the-conscience considerations. *See Mitchell*, 103 F.4th at 431; *Guertin*, 912 F.3d at 924.

Whitehouse asserts his actions did not shock the conscience. (Doc. 26 at 253-55.) He acknowledges Aulizio did not consent to Narcan but points to Aulizio's admission that the Narcan had no negative side effects. (*Id.* at 253 (citing Doc. 22-1 at 151).) To Whitehouse, he and other first responders reasonably believed Aulizio, a known drug user, was experiencing another drug overdose and Narcan was necessary to safely transport him to jail. (*Id.* at 253-54.)

Further, the government has a strong interest in protecting life and preventing drug overdoses. (*Id.* at 254.)

Aulizio maintains he has shown Whitehouse's conduct shocks the conscience. (Doc. 27 at 292-94.) Because the right to bodily integrity is so fundamental, forcing medication without consent "presumptively shocks the conscience," he urges. (*Id.* at 293.) Aulizio acknowledges that presumption can be rebutted by a compelling state interest. (*Id.*) But he asserts there is nothing before the Court to show there was a compelling state interest in forcing Narcan on him. (*Id.*) In sum, Aulizio argues "[f]orcing unwanted medical treatment on an unwilling individual, no matter how it is done, shocks the conscience." (*Id.*)

On reply, Whitehouse contends medical personnel were faced with the "heat-of-the-moment choice between administering a non-invasive and side-effect-free drug or applying no care and risking an overdose." (Doc. 29 at 301.) He further asserts there is a legitimate government purpose in protecting life and supporting life-saving overdose care. (*Id.* at 302 (citing authority such as *Harper*, 494 U.S. at 227, and 42 U.S.C. § 290ee (encouraging funding for opioid overdose reversal medication).)

Aulizio failed to meet his burden at this step of the substantive due process inquiry. By asserting, without support, forced medical treatment always shocks the conscience, he collapses both steps of the substantive due process inquiry into one. Even when viewed in the light most favorable to Aulizio, the evidence is as follows. Emergency personnel responded to reports Aulizio was about to pass out in the Dollar General. (Doc. 24 at 12:38:04, 12:39:05-14, 12:47:23; Doc. 26-2 at ¶ 3.) He was confused how he got there, had trouble completing responses to questions posed to him, and was agitated. (Doc. 24 at 12:37:46-49, 12:38:00-51, 12:39:53-12:40:03.) And there are several references to Aulizio's pinpoint pupils from Van

Kanegan, Whitehouse, and Ellwood-Bellas. (*Id.* at 12:39:14-24, 12:40:21-26, 12:46:20-38.) Pinpoint pupils are a sign of drug use and Aulizio had a history of drug abuse. (Doc. 22-1 at 163-64.) Throughout the incident, first responders accused Aulizio of overdosing or being high. (Doc. 24 at 12:38:13-45, 12:39:18-24, 12:43:22-27, 12:43:37-58, 12:46:20-38.) Medical personnel prepared to leave the scene before Ellwood-Bellas learned about Aulizio's warrant. (*Id.* at 12:39:44-49.)

Once Aulizio was arrested, first responders owed him a duty of adequate medical care. *Jackson*, 429 F.3d at 590 (citing *DeShaney*, 489 U.S. at 199-200). Whitehouse and others on the scene observed Aulizio to be overdosing. (Doc. 24 at 12:38:13-45, 12:39:14-24, 12:40:21-26, 12:43:22-58, 12:46:20-38.) Whitehouse believed administering Narcan was in Aulizio's medical interest to urgently reverse an opioid overdose before transporting Aulizio to jail. (*Id.* at 12:47:23-38.) Even if Narcan was not medically necessary, Aulizio acknowledges it did him no physical harm. (Doc. 22-1 at 150-5, 171-72.)

The time for deliberation, Aulizio's status as a pretrial detainee, and the legitimate government purpose of preventing an overdose show Aulizio fails to establish conscience-shocking conduct. *See Mitchell*, 103 F.4th at 431; *Guertin*, 912 F.3d at 921-24. The government has a legitimate interest in preserving human life. *See Cruzan*, 497 U.S. at 280. Even if Aulizio had opioids in his system and Narcan made him sick, that risk would be outweighed by the compelling state interest of preventing him from a suspected opioid overdose as he was transported to jail. Whitehouse was not deliberately indifferent in providing medical care nor did he disregard a substantial risk of serious harm. Whitehouse and other medical personnel did the opposite—they introduced a potentially lifesaving substance through a minimally invasive nasal syringe. And that substance had no harmful physical side effects on Aulizio. Whitehouse's

conduct had a legitimate governmental purpose. In viewing the evidence in the light most favorable to Aulizio, no jury could find attempting to administer Narcan to prevent a suspected opioid overdose is conscience-shocking conduct.

Because Aulizio has not met his burden to establish a constitutional violation, the Court need not consider whether the right was clearly established. Whitehouse is entitled to qualified immunity on Aulizio's substantive due process claim.

## III. CONCLUSION

For the reasons stated herein, Defendant Shawn Whitehouse's Motion for Summary Judgment (Doc. 26) is GRANTED.

**IT IS SO ORDERED.**

Date: August 18, 2026

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE